[No. 34036-4-II.   Division Two.   January 9, 2007.]

JACK THOMPSON, JR., ET AL., *Appellants*, v. THE DEPARTMENT OF ECOLOGY, *Respondent*.

*Wayne D. Hagen, Jr.*, for appellants.

*Robert M. McKenna, Attorney General, Colleen G. Warren, Senior Assistant*, and *Laura J. Watson, Assistant*, for respondent.

¶1 Van Deren, J. — Jack Thompson, Jr., appeals the Shorelines Hearings Board (SHB) ruling that affirmed the

Department of Ecology's (Department) denial of a variance based on the location of the ordinary high water mark (OHWM) on his riverfront property. The SHB identified the OHWM based on the point where the riverbank vegetation transitions from aquatic to terrestrial. Thompson argues that the OHWM should be marked at the beginning of all vegetation, aquatic or otherwise. Because the SHB's demarcation is consistent with the plain language of the statutory definition, we affirm.

## FACTS

¶2 Thompson owns 10 acres of real property along the south bank of the North River in Grays Harbor County (County). He built a storage shop within an area designated as a conservancy environment under the County's shoreline master program (SMP) and, later, without obtaining the necessary permits, converted a portion of this shop into a residence. His residence addition included a deck along the northern and eastern sides of the structure. The north deck extends 16 feet from the building toward the river and was intended to serve as the only means of ingress and egress to the residence. The SMP establishes a 50-foot setback requirement from the OHWM, as delineated in the Shoreline Management Act of 1971, chapter 90.58 RCW, unless a variance is granted.

¶3 After the County received complaints about illegal development on the property, Thompson was ordered to stop further development. He then sought various permits, including a variance of the 50-foot setback requirement from the OHWM for his north deck. The Department denied the variance, and Thompson appealed to the SHB. Because the 50-foot setback begins at the OHWM, the SHB determined that it needed to know the location of the OHWM. It remanded to the Department for further investigation.

¶4 Five people variously identified the location of the OHWM on Thompson's property. The surveys conducted by Department employee Perry Lund and by Thompson's

retained expert, Patrick Beehler, are of significance. Lund studied the vegetation on the riverbank and marked the OHWM at the point where aquatic vegetation, typically that associated with growing in water, transitioned to terrestrial vegetation, i.e., plants that can tolerate occasional, but not frequent, inundation. Beehler located the OHWM where vegetation began without accounting for a change in vegetation from aquatic to terrestrial, thus placing the mark farther into the riverbed.

¶5 The Department adopted Lund's mark. As a result, the entire north deck, as well as a portion of the building, was within the 50-foot setback. The Department required Thompson to remove the north deck, but allowed him to build a six-foot-wide stairway on the north end of the building for access.

¶6 Thompson appealed to the SHB. Concluding that the definition of OHWM requires the absence of terrestrial vegetation below the mark, but not the absence of all vegetation, the SHB affirmed. On further appeal, the superior court affirmed, finding that the statutory OHWM definition contemplates "a place that shows a distinct change in character in the vegetation." Clerk's Papers at 59.

## ANALYSIS

¶7 The sole issue we must decide is whether the SHB misinterpreted or misapplied the law in determining the location of the OHWM on Thompson's property. Thompson focuses on a portion of our Supreme Court's definition of the OHWM found in *Austin v. City of Bellingham*, 69 Wash. 677, 126 P. 59 (1912), to support his assertion that the SHB erred. He relies on that portion of the definition stating that the OHWM is the line indicating where soil is submerged so long or frequently " 'that vegetation will not grow on it.' " *Austin*, 69 Wash. at 681 (quoting 4 WORDS AND PHRASES 3290); *see Pub. Util. Dist. No. 1 of Pend Oreille County v. Tombari Family Ltd. P'ship*, 117 Wn.2d 803, 805, 819 P.2d 369 (1991) (approving *Austin*, 169 Wash. 677). Emphasizing that this-

definition contains no distinction between aquatic and terrestrial vegetation, Thompson argues that the SHB erred when it applied such a distinction to his property.

¶8 Under the Administrative Procedure Act, chapter 34.05 RCW, a party challenging an agency action bears the burden of demonstrating the invalidity of that action. RCW 34.05.570(1)(a). Here, Thompson must show that the SHB "erroneously interpreted or applied the law." RCW 34.05.570(3)(d). Although "[w]e review questions of law de novo, . . . we accord substantial weight to an agency's interpretation of the statutes it administers." *Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus.*, 112 Wn. App. 291, 296, 49 P.3d 135 (2002) (citing *Everett Concrete Prods., Inc. v. Dep't of Labor & Indus.*, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988)).

¶9 The Shoreline Management Act defines the OHWM as:

> that mark that will be found by examining the bed and banks and ascertaining where the presence and action of waters are so common and usual, and so long continued in all ordinary years, *as to mark upon the soil a character distinct from that of the abutting upland, in respect to vegetation.*

RCW 90.58.030(2)(b) (emphasis added). By the statute's plain language, the OHWM occurs where the presence of water is reflected in the vegetation. The SHB has acted reasonably in interpreting this as implying a distinction between aquatic and terrestrial vegetation.

¶10 Thompson attempts to limit this definition by invoking *Austin*'s reference to soil that is submerged so long that " 'vegetation will not grow on it.' " *Austin*, 69 Wash. at 681 (quoting 4 Words and Phrases 3290). In support of *Austin*'s continuing validity, Thompson relies on *Tombari*, in which our Supreme Court approved *Austin*'s general principles. *See Tombari*, 117 Wn.2d at 804-05. But neither *Austin* nor

*Tombari* involved the interpretation of the Shoreline Management Act.[1]

¶11 In fact, *Austin*'s agricultural use-based definition of the OHWM does not, as Thompson contends, draw a bright line at the edge of any vegetation. The entire description that precedes the portion Thompson relies on refers to terrestrial, agricultural vegetation that can withstand frequent inundation:

> "High water mark does not mean the height reached by unusual floods, for these usually soon disappear. Neither does it mean the line ordinarily reached by the great annual rises of the river, which cover in places *lands that are valuable for agricultural purposes*, nor yet does it mean *meadow land adjacent to the river*, which, when the waters leave it, is adapted to and can be used *for grazing or pasturing purposes*. The line, then, which fixes the high water mark is that which separates what properly belongs to the river bed from that which belongs to the riparian owner—that is, the owner of adjoining land. Soil which is submerged so long or so frequently, in ordinary seasons, that vegetation will not grow on it, may be regarded as a part of the bed of the river which overflows it."

*Austin*, 69 Wash. at 681 (emphasis added) (quoting 4 WORDS AND PHRASES 3290).

¶12 Furthermore, *Welch v. Browning*, 115 Iowa 690, 87 N.W. 430 (1901), from which *Austin* drew the description, clarifies that where vegetation that can withstand frequent inundation begins marks the limits of the OHWM. *Welch*, 115 Iowa at 692-94. The jury instructions approved in *Welch* stated:

> "Soil which is submerged so long or so frequently in ordinary seasons, that vegetation will not grow upon it, may be regarded as part of the bed of the river which overflows it. . . . Trees may be included under the general head of vegetation, but trees which grow and flourish best in the immediate vicinity of running streams that are subject to overflow, and which shoot up in places as the water recedes, and which can withstand the

---

[1] *Austin* predates the Shoreline Management Act by 59 years and, thus, we do not view it as an interpretation of the act's subsequent definition.

effect of water encompassing the lower part of their trunks without injury, and for a longer period than other kinds of trees, should not necessarily be classed as the kind of vegetation to which the law refers as marking the limit of ordinary high water . . . , unless the soil on which they grow is adapted to and can be used for agricultural purposes, or so far removed from the effect of ordinary high water as to become permanent."

*Welch*, 115 Iowa at 693.

¶13 *Tombari* is also consistent with the SHB's reliance on a difference between terrestrial and aquatic vegetation. The issue in *Tombari* was whether the OHWM should be drawn at the highest point reached by the river each year and the court did not consider exactly how the OHWM should be calculated. *See Tombari*, 117 Wn.2d at 804. But both articles cited by *Tombari* in support of its statement that the *Austin* principles conform generally to other jurisdictions draw the line at terrestrial vegetation. *See* Frank E. Maloney, *The Ordinary High Water Mark: Attempts at Settling an Unsettled Boundary Line*, 13 LAND & WATER L. REV. 465, 470 (1978) ("The OHW[M] represents the point at which the water prevents the growth of terrestrial vegetation."); Edgar B. Washburn, *The Riparian Developer's Dilemma: Locating the Boundary of Navigable Lakes and Rivers*, 18 REAL PROP. PROB. & TR. J. 538, 545 (1983) ("Assuming that both terrestrial and aquatic vegetation exist in the same area, the presence of terrestrial plant life governs.").

¶14 In summary, Thompson's offered authority does not purport to construe the Shoreline Management Act. The act's plain language describes the OHWM as the line where the water's presence is reflected in the vegetation. This can reasonably be interpreted as meaning that the line occurs where the river has caused aquatic vegetation to grow, an interpretation that is consistent with other jurisdictions. Accordingly, the SHB did not erroneously interpret or apply the law by locating the OHWM where aquatic vegetation transitioned to terrestrial vegetation and correctly affirmed

the Department's denial of a variance from the County's SMP.

¶15 Affirmed.

HOUGHTON, C.J., and HUNT, J., concur.

Review denied at 161 Wn.2d 1023 (2007).